ANNIE HAUER, Landlord, *v.* JAMES WILLIAM MANIGAULT, Tenant. "JOHN" DRAYTON and Others, Undertenants.

Municipal Court of New York, Borough of Manhattan, Tenth District, October 15, 1936.

*S. S. Hauer*, for the landlord.

*Montague Casper*, for the tenant James William Manigault.

LEWIS (DAVID C.), J. This is a summary proceeding based on the alleged use of a portion of the premises for the purpose of prostitution. The premises were originally constructed and occupied as a private dwelling; but are now used as a furnished room house. The landlord is the owner. The defendant is the tenant of the entire building where he conducts the furnished room business.

Furnished room houses have become extensive throughout the city. Furnished rooms constitute the homes of many people. It is estimated there are 16,000 multiple dwellings throughout the city occupied for this purpose and some 300,000 or more people are residents of these houses. By far, the great majority are undoubtedly properly maintained and conducted. I take it, therefore, that any one engaged in this enterprise is bound to respect public morals and decency and maintain the premises as an abode befitting good people. Private rights and public interests combine the obligation. Of course, this may not always be a simple task in our city where we loathe the busybody. However, the rights of privacy cannot permit or protect an affront to public decency.

Prostitution has no more license in a furnished room than a pent house. In fact, the call for alertness is greater in one than the other.

The nature of the business gives the proprietor of the furnished room house the greater opportunity to know how his premises are being used. The greater opportunity imposes a corresponding obligation.

The tenant claims that when he leased this building, the premises bore a bad repute, apparently without the knowledge of the owner. The reputation was apparently so common (bad) that the defendant communicated with the police captain of the precinct and subsequently with the police commissioner of the city and mayor of the city. It may be that these alleged communications were sincere gestures, but they cannot be substituted as a complete discharge of the duty resting upon the shoulder of the landlord-lessee, nor could they shift the entire responsibility to the public authorities. Such a situation called for real supervision on the part of the landlord-lessee.

After the tenant took possession, we find:

On July 6, 1936, a subtenant on the fourth floor was arrested and found guilty of prostitution.

On August first eleven occupants of rooms on the third floor were apprehended, charged with the same offense. (Note: Among the eleven was the same female apprehended and convicted on the sixth of July.)

Again, on August ninth there were eight arrests made on the third floor — three women and five white males.

And on August fifteenth five individuals were taken into custody on the same charge involving apartment No. 2 on the second floor.

We come to the question whether this landlord-lessee is to be dispossessed because of the offenses and conduct of his subtenants.

To a great extent the answer depends upon the interpretation we give to the statute. (Multiple Dwelling Law, §§ 352–354; Tenement House Law, §§ 151–154; Civ. Prac. Act, § 1410; Real Prop. Law, § 231.)

This house is a class B multiple dwelling. The penalties and provisions applicable to class A multiple dwellings cannot be applied against it. (Multiple Dwelling Law, § 4, subd. 5.)

Were it a class A dwelling, the right to maintain summary proceedings would have added support. (Multiple Dwelling Law, §§ 350–354.)

The provisions of section 1410 of the Civil Practice Act apply to real property in general. These provisions are not restrictive to any particular type of premises, nor any particular part of the premises. Where any part of any premises are used or occupied for purposes of prostitution or other illegal business, summary proceedings lie.

The use of any part of premises for any illegal business will condemn the occupancy, whether the building is a skyscraper or a taxpayer or a private dwelling or a public inn. Harsh as it may seem, the wrongdoing of a subtenant can result in the ouster of the tenant of the entire premises and work a forfeiture of his estate. (Ross v. Jacobowitz, 216 App. Div. 184.) Here we find the sins of the tenant may be visited upon the landlord-lessee.

A penalty of such severity can only be imposed with caution. There should be either proof that the landlord-lessee participated in the use of the premises for the illegal purpose or evidence of his permission for such use of the premises. But that does not mean that there must be express consent. Passive acquiescence may spell consent; and a failure to protest or abate, after knowledge or notice is shown, may evidence acquiescence.

Unless moral properties are not to be considered on a par with material values, it seems just as reasonable to apply the rule of constructive notice to moral dereliction of persons as it is to apply that principle to physical defects of property. On this theory, proof of actual personal knowledge on the part of the landlord-lessee is not essential to establish permission. When facts warrant suspicion, there comes a time when no one can be so blind that he will not see. Convenient indifference is not to be confused with pardonable ignorance. None of us can feign ignorance of the weakness or the wickedness of life, and here the facts of life are the facts of law, and guide the court.

The provisions of the Multiple Dwelling Law are consistent with this thought of constructive notice.

Section 354 of the Multiple Dwelling Law declares that proof of the ill repute or the common fame of the premises, or the reputation of those resorting thereto, shall constitute presumptive evidence of the landlord's permission.

" As to the second, there is no evidence of actual knowledge and little, if any, evidence from *which to draw an inference constructively.*" (Italics mine.) (*Ross* v. *Jacobowitz,* 216 App. Div. 184, at p. 186, *supra.*)

Nor can any one claim complete surprise with this situation. The wrong is defined and the consequences foretold. Cause and effect are known and stated.

No tenant of the entire premises, by merely opening the door to a subtenant of a room, can expect to walk out of the picture. As the landlord, he cannot in this way conveniently entirely shift the duty to see that the law is upheld and thus dodge all responsibility for its violation. Of course, a single act of prostitution by a subtenant standing by itself without any proof of participation or permission of the landlord-lessee could not establish a case, particularly where the subtenant is promptly evicted on the discovery of his wrongdoing. But repeated acts of prostitution may indicate or evidence a use. Such a situation presents an indictment that calls for a different plea and proof.

" If, however, there has been a ' use ' for prostitution in that sense, we think it is not a defense that the use was unknown to the owner. The statute does not make his liability dependent upon knowledge or even upon negligence. It makes his liability dependent upon the prohibited use. If use is interpreted to mean, not an isolated act, but a practice or relation, the statute, we think, charges the owner with the duty to *inform himself of the conditions prevailing in his building.* In the long run, and looking, as legislation must, to the average results, the law, as thus construed,

is not likely to work injustice. If the occupant of an apartment has used it for indiscriminate intercourse with men, has used it in the sense that she has kept or maintained it for that purpose (*Comm.* v. *Cook*, 12 Metc. 93; *State* v. *Ruhl*, 8 Ia. 447, 454), the diligent owner will seldom be blind to the offense. Looking, then, to the average results, the Legislature has said that the owner must prevent at his peril a vicious use which can rarely be continued without his fault. It rules out inquiry into his excuses in the particular instance, because such excuses, if accepted, *would tend to nullify the law.* It frames its rules to meet the necessities of the average, rather than the exceptional case, and adjusts its penalties in correspondence with the common experience of mankind." (*Tenement House Dept.* v. *McDevitt*, 215 N. Y. 160, at p. 167. See *Matter of Coste* v. *Pappas*, 236 App. Div. 175.) The tenant seeks to defeat the proceedings because there is no proof that the illegal acts continued up to the commencement of the proceedings. There are some judicial expressions to such effect. If such rulings were all inclusive, they would practically prohibit these proceedings. I do not believe they are. The wrong must first be committed before it can be discovered. Prosecution can only follow crime.

One observes that while these proceedings are based on illegal acts, the guilt need not be personal.

The statute reads where " any part of the premises are used." The law only exacts that such use must be either with the permission or with the knowledge, actual or constructive, of the landlord-lessee. (*Ernst* v. *Crosby*, 140 N. Y. 364, 367.)

It is not even necessary to establish that there has been an actual illegal use. It is sufficient if the acts and conduct complained of warrant the inference of acquiescence in an occupancy contemplating the prohibited purposes.

" It was the opinion of the court below, that, irrespective of the tenant, the law prohibiting the use of premises for purposes of prostitution is not violated, unless it is established by direct or circumstantial evidence that the premises were actually used for such purpose by the occupant of a room. Such a strained construction would virtually nullify the statute in question. * * * The statute is concerned with those who permit the use of premises for the purposes in question." (*W. & E. Realty Co.* v. *Mantell*, 191 N. Y. Supp. 220, at p. 221.)

It seems the common practice in this type of proceeding to simply go through certain motions, apparently knowing the futility of the undertaking.

The usual trial presents substantially the following picture: An arrest has been made on the premises for the possession of a slip bearing numbers; or for alleged gambling; or for an isolated instance of prostitution. In many, if not most instances, the accused or the apprehended is not a tenant. After the arrest the police notify the landlord; the landlord institutes summary proceedings for illegal use; and this court is asked to determine the matter. Invariably the landlord has experienced no previous difficulty with his tenant; and the tenant pleads innocence. The landlord does not want the tenant out, and the tenant does not want to move out. And neither landlord nor tenant admits any knowledge about wrongdoing. At least, that is the testimony presented to the court.

Can such judicial procedure be recommended? It seems to me that such practice means a waste of time and effort upon the part of the police, the property owner, the profession and the court. It reduces the proceedings to a precaution by the landlord against possible penalties, and lowers the dignity of the court.

Undoubtedly more inquiry and investigation by the parties (the authorities and the landlord and the owner) before trial, with a fuller presentation upon the trial, will serve to give these proceedings real force and effect. This case might be considered a single instance.

Final order for the landlord. Five days' stay.