Maxwell, Shapiro, J.
By this holdover summary proceeding, the landlord seeks to bring to an end the lease of the entire building located at 420 West 121st Street, New York City, which lease has 13 years to run, because of the long course of conduct of roomers involving narcotics addiction, prostitution, attempted rape, homicide and other disreputable occurrences.
Although adjacent to one of our leading institutions of learning and culture, the premises, operated as the Bryn Mawr Hotel, are located in a section of this city where many happenings have taken place, dangerous to the life, security and comfort of people living there and those who travel through it. The subject premises have been marked by the Police Department as a focal point for the gathering of persons bent upon committing immoral, illegal and dangerous acts. The record is replete with repeated arrests of roomer-occupants for narcotics addiction, for prostitution and other heinous crimes.
No one hearing the testimony elicited at this trial can help but shudder at the degradation which has befallen the inhabitants of this section of our city. Conditions in this area had come to that unhappy pass where the local people, including the university and other institutions, banded together to establish a private 24-hour security patrol. When citizens band together to protect themselves because the conditions are so severe as to vitiate even the most diligent and comprehensive efforts of the municipal departments charged with the protection and security of the local citizenry, then, indeed this court is most sensitive to their plight.
In the face of these reprehensible and highly dangerous circumstances, the tenant challenges the jurisdiction of this court to hear this proceeding. The tenant further claims that this is a valuable lease of an entire building possessing a monetary *588 level of upwards of $100,000 and hence the landlord seeks a forfeiture of tenant’s substantial property. The tenant also asserts technical objections, claiming that the lease merely calls for tenant’s diligent efforts after notice to cure the complained of conditions, and not their actual alleviation.
Responding to the evidence plainly showing repeated occurrences of inimical and dangerous behavior, tenant says that after such occasions came to its attention it took steps to remove the offending occupant. But tenant admits nothing was done and no procedure adopted to screen out potentially undesirable occupants. All that was required of any roomer was the payment of one week’s rent in advance. Hardly indeed can this be a method by which undesirable roomers would be excluded from the building. Tenant in effect says that inherent in the operation of a rooming house is the inevitable attraction, as occupants, of narcotic addicts, prostitutes and other malodorous and evil characters. With rather callous attitude, the tenant affirms that this is the ‘ ‘ nature of the beast ’ ’, that thereby the tenant automatically acquires an exculpatory shield against landlord’s and the community’s efforts to rid the area of this blight.
Manifestly, this argument would sustain and protect evil and wrongdoing by giving it a base for operation — which in effect has happened here. The vital question really is: Can the landlord terminate a tenancy where the permitted use, though on its face a legal one, actually turns out to be a haven for degradation dangerous to the entire community?
Tenant’s answer to this question is that the landlord is helpless so long as the tenant, after the offending acts are committed regardless of their continuity and repetition, calls in the police or takes other steps to terminate the occupancy. Thus the attitude of the tenant is that it need do nothing to prevent the blight but merely take action after the corrupt acts have exploded into grevious antisocial behavior.
Unless there is the most persuasive basis therefor, tenant should not have available such a defense to excuse it from adopting a more effective and rigorous tenant selection procedure. It could never have been intended that technical lease provisions can and are to be the device by which the tenant can ignore its obligations to the public and the community, not only to cure evil conditions after their eruption, but also to take reasonably effective measures to prevent their occurrence.
Tenant asserts the theory that the provisions of this lease with regard to its termination set up conditions subsequent as distinct from conditional limitations, and that the former call for a forfeiture and not an expiration of the term of the tenancy. *589 Tenant goes on to argue that summary proceedings will not lie to give force to conditions subsequent and that hence this court has no jurisdiction.
Veiled in language ofttimes confusing and contradictory, the doctrines distinguishing condition from conditional limitations have become perplexing in their application (Jamaica Bldrs. Supply Corp. v. Buttelman, 25 Misc 2d 326; 1 Warren’s Weed, N. Y. Law of Beal Property, p. 571 et seq.; 3 N. Y. Law of Landlord and Tenant, § 974). But basic in all of the determinations is the search for the intentions of the parties (Lyon v. Hersey, 103 N. Y. 264, 269; Walsh, Law of Property [2d ed.], § 174, p. 293) as to whether the specified term shall be accelerated to its close if the prohibited or proscribed circumstances are found to exist (Miller v. Levi, 44 N. Y. 489), or the tenancy is to continue dependent upon an option or choice solely resting with the landlord, accompanied by a consequent enforced right of re-entry and forfeiture (Beach v. Nixon, 9 N. Y. 35).
Although it has been held that landlord’s option to terminate, standing alone, constitutes a condition and not a conditional limitation (Obedin v. Masiello, 20 Misc 2d 101, affd. basically on ground of waiver 13 A D 2d 820), many cases significantly hold that the turning point of decision is not whether the landlord has the option to determine but rather “ whether the lease evinces a clear intention that an event, even though its occurrence is optional with the landlord, shall, when it transpires, end the lease as if it by its terms had been limited to that time ” (Reisberg v. Ownit Realty Corp., 133 Misc. 156, 157; 3 N. Y. Law of Landlord and Tenant, § 974; see, also, Burnee Corp. v. Uneeda Pure Orange Drink Co., 132 Misc. 435; Ehret Holding Corp. v. Anderson Galleries, 138 Misc 722; Pisarek v. Sikora, 29 Misc 2d 457; cf. Stitt v. Rubin, 200 Misc. 487 [App. Term, 2d Dept.]).
Based upon the policy against forfeitures under circumstances where the complained of event was trivial as compared with the loss to be suffered by the tenant, courts have avidly sought detours and by-roads so as to construe the existence of conditions subsequent or waiver rather than conditional limitations (98 Delancey St. Corp. v. Bar ocas, 82 N. Y. S. 2d 802, affd. 275 App. Div. 651; Benner v. Coury, 106 N. Y. S. 2d 857; Small v. De Bruyn, 187 Misc. 1045). However, the facts before this court do not invite such solicitude and concern for the tenant. Unlike situations of a technical and excusable nature, here we have menacing episodes spawned in the leased premises and extending over a long period of time.
*590 Unlike many cases where the breach of the lease gave landlord only the right of re-entry, here upon the breach ‘ ‘ the term * * * shall immediately cease and determine ’ Manifestly this lease requires no re-entry to bring it to an end — its end is specifically brought about in hcec verba. By verbalizing the distinction between “termination” and “ expiration ”, massive difficulties have crept into the law, Rather emphasis should rest not on whether the landlord has an option to call for an earlier “ expiration ” or for a sudden “ termination ”, but whether the landlord-tenant relationship is cut off by re-entry alone, or, it sooner ends under the specific lease terms because of the breach of its restrictive provisions (see Norman Riesenfeld, Inc. v. R-W Realty Co., 223 App. Div. 140).
Paragraph 4 of this lease pointedly proscribes the premises from being used “ for any business or purpose deemed disreputable.” That these premises were suffered by the tenant to be so used is amply supported by the evidence. The court further finds that tenant’s manager knew (see Mandelbaum v, Fromberg, 131 N. Y. S. 691) that persons lewd, base and vicious would seek occupancy to shelter their illicit conduct. Yet despite this knowledge and despite the portents of evil behavior, so long as tenant extracted one week’s rent in advance, it admitted everyone who applied.
Ascribing to this pattern of tenancy a choice and option in the landlord to permit or not to permit its continuance is to raise the landlord’s selection and condonation of the use of its property above the law and public welfare which so emphatically prohibits and penalizes such use. Rather, indeed, sense and meaning are given to these covenants as establishing merely the date, pursuant to notice, when the tenancy shall end. No choice and no option in the face of these reprehensible conditions rested with landlord to terminate or not to terminate this tenancy. Contrariwise, the law and the intention of the parties as found with respect to these circumstances compelled the end to this tenancy regardless of the will of the landlord. To countenance or to ignore this duty would have brought down on landlord’s head the shroud of participation, if not by direction certainly by indirection, in these interdicted and unlawful acts (Penal Law, § 1146; Multiple Dwelling Law, §§ 12, 350-360).
Preserved even from the very beginning of the New York Summary Proceedings Statute (Rev. Stat. of N, Y., part III, ch. VIII, tit. X, § 28; Code Civ. Pro., § 2231, subd, 5; § 2237; Civ. Prac. Act, § 1410, subd, 5; Real Property Actions and Proceedings Law, § 711, subd. 5) was the availability of summary proceedings to oust a tenant of premises used for prostitution, *591 or “ house or place of assignation for le,wd persons ”. That the Bryn Mawr Hotel was used as the rendezvous for roomers bent on dissolute and profligate behavior is clear; that this summary proceeding could be maintained under subdivision 5 of section 711 of the Beal Property Actions and Proceedings Law, and under section 352 of the Multiple Dwelling Law, is equally clear (Hauer v. Manigault, 160 Misc. 758; see Tenement House Dept, of City of N. Y. v. McDevitt, 215 N. Y. 160).
From the early beginnings, the summary proceedings statute was deemed to be remedial and its purposes not to be easily defeated. (Lynde v. Noble, 20 Johns. 80; Birdsall v. Phillips, 17 Wend. 464; see Sage v. Harpending, 49 Barb. 166.) As its title plainly indicates, the statute intended the proceeding to be summary, short, sharp and decisive; this legislative intent was and is to be given full effect (People ex rel. Allen v. Murray, 23 N. Y. Civ. Pro. Rep. 71, affd. 21 N. Y. S. 797).
Consonant with its purposes and in accord with legislative intent (see Badin, A Short Way with Statutes, 56 Harv. L. Bev. 388, 400), this court holds that it has jurisdiction over this proceeding because under the lease terms the tenancy had expired and, even if this not be so, the petition and proof are sufficient under subdivision 5 of section 711 of the Beal Property Actions and Proceedings Law, to warrant a final judgment for landlord.
Judgment for landlord against the tenant and subtenants. Issuance of warrant stayed to March 31, 1965. Use and occupancy to be paid at present rental.